FILED & JUDGMENT ENTERED
Steven T. Salata

Jul 23 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HICKORY PRINTING GROUP, INC., | ) | Case Number: 10-51051 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| JAMES T. WARD, SR., *Trustee for Hickory Printing Group, Inc.*, | ) | Adversary Proceeding No. 11-03130 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF GRANITE and HICKORY PRINTING SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PHASE 1 ISSUES AND DENYING DEFENDANTS' CROSS-MOTION

In this action, Plaintiff James T. Ward, Sr. ("Plaintiff"), Chapter 7 Trustee for Debtor

Hickory Printing Group, Inc. (the "Debtor"), seeks to avoid under a variety of theories a security

interest held by Defendant Bank of Granite (the "Bank") in the Debtor's inventory and accounts

receivable (the "Collateral").  The Trustee maintains that shortly before bankruptcy the Bank (1) re-perfected a security interest in the Debtor's inventory and accounts receivable, and (2) its underlying loan was paid off when the Debtor's business was sold to Defendant Hickory Printing Solutions, LLC ("Solutions") shortly before bankruptcy.  He seeks to recover $4,945,421 from the Defendants under Section 550, as the value of the alleged voidable transfers.

The Bank and Solutions deny these assertions. They maintain that the Bank's security interest was re-perfected long before bankruptcy and is not avoidable.  They further maintain that the sale to Solutions was the only viable option available to the Debtor, a distressed corporation.

The parties have agreed to phased discovery in the action.  The first phase of discovery was limited to the factual and legal issues relating to certain UCC filings made by the Bank, as alleged in paragraphs 13, 14 and 20 of Plaintiff's Complaint ("Phase 1").  See Compl. ¶¶ 13-14, 20, ECF No. 1.[1]

After conducting Phase 1 discovery, the Plaintiff filed a Motion for Partial Summary Judgment pursuant to Fed. R. Bankr. P. 7056.   In the Defendants' Brief in Opposition to Trustee's Motion,[2] they also request partial summary judgment in their favor.  A hearing on these filings was held on February 16, 2012.  Both sides agree that the salient facts are not in dispute, and the decision is one of law.  Each has extensively briefed the legal issues.

## STATEMENT OF POSITIONS

### I.  Trustee's Position

In the current motion, the Trustee seeks partial summary judgment on Phase 1 issues. Specifically, he asks this Court to rule that:

---

[1] See Consent Substitute Pre-Trial Order entered by this Court on August 17, 2011.
[2] Defendants have not formally moved for summary judgment, but both sides approached the hearing as if they had. Rule 56(f) is broad enough to treat their request as a countermotion for summary judgment.

a. The Bank's original security interest in the Collateral was terminated by the Bank filing a Termination Statement on December 1, 2008.

b. The Bank's subsequent filing of a Correction Statement on November 10, 2009, did not alter the effectiveness of the prior Termination Statement, and, as a matter of law, did not revive the Bank's perfected security interest; therefore, even after Bank of Granite filed its Correction Statement, its Lien remained unperfected.

c. The Bank's filing of a New Financing Statement on May 27, 2010, re-perfected a security interest in the Debtor's property and was a transfer of the Debtor's property under the Code.

## II. The Bank's and Solutions' Position

The Bank and Solutions make several counter arguments. First, the Defendants maintain that the Termination Statement was filed by the Bank in error, and the record should be reformed to reflect this fact. Second, the November 2009, filing that the Trustee (and the form) deem a "Correction Statement" was not really a correction statement, but was instead a part of the Bank's Financing Statement. According to the Defendants, the November 10, 2009, filing prevented the earlier Termination Statement from being seriously misleading. The combined effect of the Original Financing Statement, the Termination Statement, and the "Correction Statement" was to provide record notice to the world of the Bank's security interest in the Debtor's accounts receivable and inventory. In short, Defendants argue the Bank's security interest was perfected at all times after November 10, 2009, and was not avoidable. According to the Bank, the proper remedy in this case is not to invalidate the Bank's perfected security interest, but to reform the "Correction Statement" to reflect the Bank's and the Debtor's intent.

### III. Holding

As a matter of law, the Bank's perfected Lien on the Collateral was terminated by its filing of a Termination Statement in December 2008. The subsequent filing of a Correction Statement by the Bank did not alter the effectiveness of the Termination Statement and was entirely ineffective in reversing the effect of the Termination Statement. Therefore, between December 1, 2008, and May 27, 2010—even after Bank of Granite filed its Correction Statement on November 10, 2009—its Lien remained unperfected. Because the Bank's Lien was unperfected as of May 27, 2010 (the date the Bank filed a new financing statement), that New Financing Statement constituted a transfer of an interest of the Debtor in property.

### STATEMENT OF UNDISPUTED FACTS

### I. Background.[3]

**A. The Parties.** The Bank is a community bank with its principal place of business in Granite Falls, North Carolina. Until its demise in 2010, the Debtor was a commercial printing business located in Conover, North Carolina, and a longstanding customer of the Bank. Compl. ¶ 9, ECF No. 1. Solutions is a North Carolina limited liability corporation with an office in Conover, Catawba County, North Carolina. Id. at ¶ 6. As described *infra*, Solutions purchased all of the Debtor's assets in 2010. Four months later, an involuntary bankruptcy case was filed against the Debtor by unsecured creditors who were not repaid in the sale transaction.

**B. The Line of Credit.** The Bank's lending relationship with the Debtor dates back to June 4, 1997, when the Bank provided the Debtor with a $3 million Revolving Line of Credit (the "Line of Credit"). The Line of Credit (loan number 425304) was originally secured by the Debtor's accounts receivable and inventory (the "Collateral"). The Bank originally perfected its

---

[3] All of the following facts are undisputed either by virtue of admissions in the Defendants' answers or by virtue of the testimony of the Bank's employees.

security interest in the Collateral (the "Lien") with respect to the Line of Credit by filing a UCC Financing Statement on June 9, 1997, with the North Carolina Secretary of State, reference number 001470676 (the "Original Financing Statement"). Compl. ¶ 12, ECF No. 1; Answer of Bank of Granite ¶ 12, ECF No. 10.

The Bank twice filed continuation statements for the Original Financing Statement, in February 2002 and June 2007. Ward Exs. 2, 3, ECF No. 20-1.[4] Until late 2009, the Line of Credit was regularly renewed by Bank of Granite, eventually reaching a maximum loan amount of $3.3 million.

## II. The Bank Made a Second Loan to the Debtor Secured by the Same Collateral as the Line of Credit.

In October of 2008, the Debtor requested a short-term loan from the Bank in the amount of $600,000, also to be secured by the Collateral. Oct. 2008 Letter, ECF No. 30-3.[5] The Bank made the short-term loan, which was assigned loan number 1008555 (the "555 Loan"). Because the Bank already had a financing statement for the collateral on file with the Secretary of State's Office, it did not file another financing statement for the short-term loan. See Compl. Ex. 2, ECF No. 1-2. The Debtor received the proceeds of the 555 Loan on October 22, 2008.

When made, the 555 Loan was entered into the Bank's computer system for tracking purposes by Lending Services Specialist Natasha Dula in conformance with the Bank's usual practices. Deposition of Natasha Dula ("Dula Dep.") 22-23, ECF No. 24.[6]

---

[4] Transcripts of the depositions taken in Phase 1 of this proceeding, along with Plaintiff's consecutively numbered exhibits to those depositions, are attached to Plaintiff's Motion. These exhibits will hereafter be referred to as "Ward Ex. __."

[5] Although the Note for the 555 Loan reflects that the loan was secured by inventory and equipment (rather than inventory and accounts receivable), this was a mistake and would have been corrected had the loan not already been paid off by the time the error was discovered. Dula Dep. 35-38, ECF No. 24; Ward Ex. 14, ECF No. 24.

[6] As a Lending Services Specialist, Ms. Dula's duties included inputting "new loans, modifications, letters of credit and renewals accurately . . . [and] review[ing] renewals and verify[ing] information for accuracy," among many other responsibilities. Ward Ex. 11, ECF No. 24. When working on loan renewals that were "cross-collateralized,"

The Debtor received the proceeds of the 555 Loan on October 22, 2008. A mere six days

later, on October 28, 2008, the Debtor repaid the 555 Loan. See Ward Ex. 23, ECF No. 20-10.

## III. In December 2008, the Bank Terminated its Perfected Lien on the Debtor's Inventory and Accounts Receivable.

On December 1, 2008, Bank of Granite filed a UCC-3 Termination Statement, which was

assigned reference number 20080105478G (the "Termination Statement"). Ward Ex. 6, ECF

No. 20-7. The Termination Statement specifically identifies the Original Financing Statement

making reference to it through "reference number" 001470676, and the termination box is

checked, indicating that "[e]ffectiveness of the Financing Statement identified above is

terminated with respect to security interest(s) of the Secured Party authorizing the Termination

Statement." Id. The Termination Statement effected the termination of the Original Financing

Statement and rendered the Lien unperfected.

In November and December 2008, Tiffany Smith served as the Bank's Loan Collateral

Processor. Smith Dep. 12-13, ECF No. 20-1. As a Loan Collateral Processor, Ms. Smith's

duties included "[m]aintain[ing] responsibility for the accuracy and accessibility of the Bank's

credit files [and] [a]ssur[ing] that all documentation and information [was] filed properly . . . ."

Ward Ex. 1, ECF No. 20-1. Ms. Smith prepared the Termination Statement and submitted it to

the Secretary of State on behalf of Bank of Granite. Ward Ex. 6, ECF No. 20-7. At the time she

filed it, Ms. Smith intended to terminate the Original Financing Statement. See Smith Dep. 78-

79, ECF No. 20-1.

In preparing and filing the Termination Statement for Bank of Granite, Ms. Smith

followed the regular practice that she had used to file hundreds of termination statements

throughout her tenure as the Bank's Loan Collateral Processor. As a first step, she reviewed all

Ms. Dula would research the status of the Bank's collateral using the Secretary of State's website. Dula Dep. 39-41, ECF No. 24.

recently paid-off loans and determined which loans required the release of collateral. Smith Dep. 98, 33-42, ECF No. 20-1. Ms. Smith received a "history report," which listed all paid-off loans, each day that she was in the office. Id. at 33-36. Her practice was to confirm that the loans on that list had been paid off for at least ten (10) days and then pull the physical loan files for each paid-off loan to determine which filings were required. Id. For loans that were not secured by real estate, such as the 555 Loan, Ms. Smith would then prepare a UCC termination statement to cancel any UCC filings on record for the collateral, unless she found "a message on the system stating that it was cross-collateralized with another loan or loans." Id. at 36. The Bank's computer system did not generate an alert message of this type for the 555 Loan. Id. at 72. Because the 555 Loan had been satisfied, the Collateral Tracking field had disappeared from the computer system. See Dula Dep. 30-31, ECF No. 24

Ms. Smith made required UCC cancellation filings on behalf of the Bank by mail or using the Secretary of State's website. Smith Dep. 40, 78, ECF No. 20-1. Indeed, Ms. Smith filed several hundred termination statements for the Bank during the eight years that she worked as Loan Collateral Processor, from 2001 to 2009. See Ward Ex. 4; Smith Dep. 12-13, ECF No. 20-1. As a general rule, no officer or other employee of the Bank reviewed Ms. Smith's work as the Bank's Loan Collateral Processor before she filed UCC documents with the Secretary of State's office. Smith Dep. 40, ECF No. 20-1. Ms. Smith testified that she filed the Termination Statement at issue here by mailing it to the Secretary of State. Id. at 78. She was authorized to make this and other UCC filings, Deposition of Beverly Fry ("Fry Dep.") 58-59, ECF No. 20-11, and was never told that she was not authorized to file financing statement terminations, Smith Dep. 98, ECF No. 20-1.

No written policies or procedures governed the Bank's filing of termination statements or the release of collateral in December 2008. Smith Dep. 41, 67, ECF No. 20-1; Fry Dep. 49, ECF No. 20-11. Rather, the practices and procedures were informal, as outlined above, and Ms. Smith followed the applicable procedures accurately. The Bank first adopted written procedures for the release of collateral in September 2009, well after the Termination Statement was filed. Fry Dep. 48-50, ECF No. 20-11; Ward Ex. 7, at 1, 4, ECF No. 20-7.

## IV.  Rather than File a New Financing Statement, the Bank Attempted to "Undo" the Termination Statement by Filing a Correction Statement.

In November of 2009, Bank executives met with representatives of the Debtor to discuss a renewal of the Line of Credit. In working on that renewal, Ms. Dula accessed the Secretary of State's website and discovered that the Bank had terminated the Original Financing Statement, which secured the Line of Credit. Dula Dep. 39-40, ECF No. 24. It is notable that Ms. Dula herself testified that the Original Financing Statement had been terminated. Id. at 39 ("since the loans are cross-collateralized, I was trying to make sure that we had UCCs in the file that we needed. So I went to the Secretary of State to get those, and I realized that it had been terminated."); see also Deposition of Carolyn Teague ("Teague Dep.") 20, ECF No. 20-9. Ms. Dula consulted her colleague Carolyn Teague, and together they decided to call the Secretary of State's Office to find out what action they could take given the termination. Dula Dep. 40-41, ECF No. 24. They did not consult anyone else about what to do. The Bank did not contact its lawyers to obtain any legal advice, and Ms. Dula and Ms. Teague did not review the Secretary of State's regulations governing UCC filings.[7] Teague Dep. 24-25, ECF No. 20-9.

---

[7] The North Carolina Secretary of State has issued comprehensive administrative regulations for the filing of UCC financing statements, termination statements and other documents. 18 N.C. Admin. Code 05B. Those regulations have the force of law, and the Court must take judicial notice of them. See So. Ry. Co. v. O'Boyle Tank Lines, Inc., 318 S.E.2d 872, 877 (1984).

Although unable to recall to whom she spoke, Ms. Teague testified that when she called the Secretary of State's Office, she asked the employee of the Secretary of State who answered the phone how the Bank could "reinstate" the terminated UCC.  Id. at 20-21.  Ms. Teague claims that she was told that she could file a correction statement.  Id. at 21.  Someone at the Secretary of State's office apparently faxed a UCC-5 correction statement form to Ms. Teague.  Id. at 22.  That form is not available on-line.[8]

Ms. Teague and Ms. Dula filled out the form together.  Teague Dep. 22, ECF No. 20-9; Dula Dep. 42-43, ECF No. 24.  They faxed the completed form to the Secretary of State and also mailed it in with a filing fee payment.  Dula Dep. 42, ECF No. 24.  The form was accepted for filing by the Secretary of State on November 10, 2009 (the "Correction Statement").  Ward Ex. 15, ECF No. 24.  Ms. Teague testified that when she prepared the Correction Statement, she reviewed it and was careful to ensure that the statement was accurate and complete.  Teague Dep. 22-23, ECF No. 20-9.

The face of the Correction Statement states that "[t]he filing of this statement does not amend any UCC record[,]" and also provides that it "is for information purposes only."  Ward Ex. 15, ECF No. 24.  The Correction Statement states that the Termination Statement was "IN ERROR."  Id.  The Correction Statement does not provide an explanation for why or how the Termination Statement was "IN ERROR," does not assert that the Termination Statement was the result of an unauthorized filing, and does not offer any other explanation for the filing of the Correction Statement.  Id.

Although Ms. Smith was not in the office when Ms. Dula learned that the Original Financing Statement had been terminated, Ms. Teague quickly informed Ms. Smith about the

---

[8] See North Carolina Secretary of State, http://www.secretary.state.nc.us/ucc/uccforms.aspx (last visited May 25, 2012).

filing of the Correction Statement.  Smith Dep. 82-86, Doc 20-1; Ward Ex. 9, ECF 20-7.  On

November 6, 2009, Ms. Teague emailed to her superiors an explanation of what had happened.

Ward Ex. 9, ECF No. 20-7.  Ms. Teague forwarded her email to Ms. Smith.  Id.  In her email to

her superiors, Ms. Teague asserted that there had been both an alert message indicating the cross-

collateralization of the 555 Loan and a note in the Collateral Tracking field.  Id.  When she

returned to the office, Ms. Smith investigated and confirmed that there had not been any alert

message in the computer system for the 555 Loan.  Smith Dep. 88-89, ECF No. 20-1.  She

explained this in a November 10, 2009, email to Mark Stephens and Beverly Fry, two of her

superiors.  Ward Ex. 9, ECF No. 20-7.  Her email also noted that it was not possible to see the

Collateral Tracking field, because the loan had been paid off.  Id.; Smith Dep. 89-90, ECF No.

20-1.

**V.  Just Before the Debtor Transferred its Assets to Defendant Hickory Printing Solutions, LLC, the Bank Filed a New Financing Statement with Respect to the Same Collateral.**

As its financial condition deteriorated in 2009, the Debtor worked with investment

banking firm Anderson LeNeave & Co. ("Anderson LeNeave") to find investment capital.

Through Anderson LeNeave the Debtor began negotiating with Consolidated Graphics, Inc.

("CGX"), regarding a stock sale transaction pursuant to which CGX would purchase all of the

Debtor's stock.  A Letter of Intent to that effect was executed on March 1, 2010, and approved

by the Debtor's Board of Directors on March 9, 2010.  By mid-May 2010, however, CGX had

determined that it would not purchase the Debtor's stock but would structure its takeover of the

Debtors' business through a combination of a collateral assignment and purchase agreement.  A

subsidiary of CGX, Defendant Solutions, was created for the purpose of accepting the transfer of

the Debtor's assets and assuming certain limited debt obligations of the Debtor.

On May 27, 2010, the eve of the transaction between Solutions and the Debtor, the Bank

filed a new UCC Financing Statement (the "New Financing Statement") under file reference

20100042561B, which asserted a security interest in the Collateral.  Compl. Ex. 10, ECF No. 1;

Answer of Bank of Granite ¶ 20, ECF No. 10.   The New Financing Statement contained an

attachment, denominated as Attachment B, which offered an after-the-fact explanation for filing

the New Financing Statement.  In this attachment, the Bank stated:

> The Bank of Granite (the "Secured Party") and Hickory Printing Group,
> Inc. (the "Debtor") entered into a Security Agreement and filed a UCC-1
> financing statement (File No. 001470676) for Loan No. 425304 on June 9,
> 1997.   Continuation statements were filed in 2002 and 2007.   A
> Termination Statement was erroneously filed on December 1, 2008,
> followed by a Correction Statement filed on November 10, 2009, which
> corrected the wrongfully filed Termination Statement.   The Secured Party
> believes that the original Security Agreement and financing statement are
> still valid, active and in force. The Secured Party is filing this UCC-1 in an
> abundance of caution to further memorialize and give notice of the Secured
> Party's interest in the collateral covered herein.

Compl. Ex. 10, ECF No. 1-10.

One day after the New Financing Statement was filed, on May 28, 2010, the transaction

with Solutions closed.  As part of that transaction, the Bank assigned the Line of Credit and the

security interest asserted therein, among other debts and rights, to Solutions in exchange for a

cash payment and other consideration.  Compl. ¶ 22, ECF No. 1; Answer of Bank of Granite

¶ 22, ECF No. 10.

## DISCUSSION

Summary judgment is appropriate if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a) (made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056).  The movant is

to identify "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any," that it believes show there is no genuine issue as to any

11

material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Once the movant has

established that there is an absence of any genuine issue of material fact, the burden shifts to the

non-movant to present some evidence of a genuine issue of material fact.   See Fed. R. Civ. P.

56(c); Celotex, 477 U.S. 317.

Applying this standard, Plaintiff is entitled to partial summary judgment in his favor.

**I.  The Termination Statement Rendered the Lien Unperfected as of December 1, 2008**.

Under North Carolina law, the filing of a termination statement renders ineffective the

financing statement to which the termination relates and causes the subject lien to become

unperfected.   See N.C. Gen. Stat. §§ 25-9-510, -513.   The filing of a termination statement

"releases the secured creditor's lien against the debtor's property."   Crestar Bank v. Neal (In re

Kitchin Equip. Co. of Va., Inc.), 960 F.2d 1242, 1245 (4th Cir. 1992); see In re Kerner Printing

Co., Inc., 178 B.R. 363, 369-70 (Bankr. S.D.N.Y. 1995) (bank's lien became unperfected upon

filing of termination statement); Rock Hill Nat'l Bank v. York Chem. Indus., Inc. (In re York

Chem. Indus., Inc.), 30 B.R. 583, 585 (Bankr. D.S.C. 1983) (termination of financing statement

rendered security interest unperfected).

Subsection 25-9-513(d) of the North Carolina General Statutes provides as follows:

> (d) Effect of filing termination statement.  Except as otherwise provided in
> G.S. 25-9-510, upon the filing of a termination statement with the filing
> office, the financing statement to which the termination statement relates
> ceases to be effective. . . .

N.C. Gen. Stat. § 25-9-513(d).  The exception identified in the introductory clause to Section 25-

9-513(c) of the North Carolina General Statutes is not applicable to the facts in this case.

Section 25-9-510(a) provides that "[a] filed record is effective only to the extent that it

was filed by a person that may file it under G.S. 25-9-509."  N.C. Gen. Stat. § 25-9-510(a).

Section 25-9-509 in turn provides that "[a] person may file an amendment . . . only if: (1) [t]he secured party of record authorizes the filing . . . ." N.C. Gen. Stat. § 25-9-509(d)(1).[9]

Thus, provided that the Termination Statement was authorized to be filed, it terminated the effectiveness of the Original Financing Statement. The Termination Statement, filed on December 1, 2008, clearly stated that the Original Financing Statement was terminated with respect to the Bank's security interest in the Collateral, and the Bank was the secured party of record authorizing its filing. Termination Statement, ECF No. 1-3. Accordingly, on December 1, 2008, the Lien became unperfected.

As to authorization for the filing, Ms. Smith filed hundreds of termination statements, followed her normal (and apparently approved) procedures when filing the Termination Statement, and intended to terminate the Original Financing Statement.

In its responses to written discovery, the Bank originally argued that the Termination Statement was not authorized. See, e.g., Bank of Granite's Resp. to Trustee's Interrog. No. 8, attached to Plaintiff's Motion ("Bank of Granite states that Tiffany Smith, who filed the 'Termination Statement,' did not have authority to file a UCC financing statement amendment on December 1, 2008[,] with respect to Loan No. 425304. During that time period, she only had authority to process Loan No. 1008555, which had been paid out on October 28, 2008. Ms. Smith mailed the 'Termination Statement' to the North Carolina Secretary of State because she mistakenly believed that the 'Termination Statement' related only to Loan No. 1008555."). However, by the summary judgment hearing, the Bank was willing to concede that, while it was a mistake, the Termination Statement was authorized.

The Official Comments to U.C.C. § 9-509 provide that "[a]s long as the appropriate person authorizes the filing . . . it is insignificant whether the secured party or another person

_____

[9] The second clause of Section 25-9-509(d) is not applicable here.

files any given record.  The question of authorization is one for the court, not the filing office."

U.C.C. § 9-509 cmt. 2.

There is no doubt that the appropriate person authorized the filing.  Ms. Smith was authorized to file termination statements as part of her duties at Bank of Granite.  Fry Dep. 58-59.  It was her job to make such filings when she determined that they were appropriate.  Smith Dep. 40.  She followed her normal procedures, which were the Bank's procedures in 2008, to determine whether the Bank should release the Collateral by filing a termination statement relating to the Original Financing Statement and then, in fact, filed the Termination Statement doing just that on behalf of the Bank.  While Ms. Smith may or may not have made a mistake in filing the Termination Statement (given that the Bank still had a loan outstanding), her mistake in no way implies lack of authorization to file the Termination Statement with the Secretary of State.  Under these circumstances, the Termination Statement is effective as a matter of law.

## II.  Even if the Bank Made an Error, the Termination Statement is Legally Effective to Release the Lien.

While the Bank maintains that the Termination Statement was mistakenly filed, it does not contend that its mistake rendered the Termination Statement ineffective.  At hearing, the Bank admitted that perfection of its Lien was terminated upon the filing of the Termination Statement.  The parties thus appear to be in agreement on this point, if little else.

Even if it is factually true that the Bank filed the Termination Statement "in error," the United States Court of Appeals for the Fourth Circuit has expressly found that a mistake in the filing of a termination statement makes no legal difference.  In re Kitchin Equip. Co., 960 F.2d 1242 (holding that a bankruptcy trustee could avoid a lien under Section 544(a) of the Bankruptcy Code because the effect of a termination statement "on a secured interest is dramatic and final[,]" even though the box marked "termination" had been checked in error).  Lenders are

14

bound by the effects of UCC termination statements, even when such termination statements are filed in error, because the entire purpose of the UCC system is to provide public notice of secured interests without requiring parties to look behind or beyond the four corners of the public filing.  See id.  That legal analysis is conclusive and binding here.

Other federal courts have also come to this precise conclusion on facts analogous to those presented in this case.  See generally In re Pac. Trencher & Equip., Inc., 27 B.R. 167, 168 (B.A.P. 9th Cir. 1983) (holding that "pursuant to clearly articulated authority," the creditor's "prior U.C.C. filings lost even marginal sufficiency upon the filing of a termination statement, albeit erroneous, and that in turn effected a lapse in perfection . . . ."), aff'd, 735 F.2d 362 (9th Cir. 1984); In re York Chem. Indus., Inc., 30 B.R. at 586 (creditor's "lien was unperfected as to the debtor in possession" because creditor had "terminated its financing statement—albeit unintentionally and inadvertently"); In re Silvernail Mirror and Glass, Inc., 142 B.R. 987, 989 (Bankr. M.D. Fla. 1992) (noting that "[t]he Termination Statement gave all indications to the world that [the creditor] was terminating its security interest in all its collateral.  The filing of a Termination Statement is a method of making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the public records").

Most recently, the District Court for the Southern District of New York had occasion to reaffirm this line of authority.  Roswell Capital Partners LLC v. Alt. Const. Techs., 2010 WL 3452378, at *7 (S.D.N.Y. Sept. 1, 2010) (concluding under Florida UCC that a creditor's contention that termination statement was unauthorized was irrelevant because even a mistaken filing of a termination statement renders a lien unperfected), aff'd, 2011 WL 3849613 (2d Cir. Sept. 1, 2011).  Relying on Kitchin, Silvernail, and In re Pac. Trencher & Equip., among other authorities, the court reaffirmed that a termination statement's effect is harsh and final.  Id.  The

court noted that this "clear rule accords with the policy of the UCC.  Potential creditors must be able to rely on termination statements filed in the public record, even if they were filed in error or without authorization."  Id.  For this reason, the UCC "places the burden of monitoring for potentially erroneous UCC-3 filings on existing creditors, who are aware of the true state of affairs as to their security interests, rather than potential creditors who will not be in a position [to] know whether a termination statement was authorized or not."  Id.

In the present case, the Termination Statement stated unambiguously that the Original Financing Statement was terminated with respect to the security interest of the Bank—the secured party of record which authorized its filing.  The Termination Statement was prepared and filed by the Bank's Loan Collateral Processor, whose job it was to determine when to make such filings releasing collateral and make them.  As a matter of law, even if mistaken, the Termination Statement was legally effective.  Upon its filing, the Lien became unperfected.

## III.   The Correction Statement Did Not Reinstate the Effectiveness of the Original Financing Statement or Alter the Effectiveness of the Termination Statement.

The Bank contends that its November 2009 filing[10], the UCC-5 Correction Statement, corrected the record and, in effect, reinstated the effectiveness of the Original Financing Statement as of November 10, 2009.

The Bank's analysis begins with the contention that the November 10, 2009, Correction Statement filing was not actually a correction statement because under N.C. Gen. Stat. § 25-9-518(a), only borrowers or debtors may file correction statements.

Secondly, the Bank notes that the new Article 9 focuses on the *substance* of the information placed of record as opposed to the *form* in which it has been placed.  It reaches this

---

[10] The Bank is careful to refer to this filing by its filing date, not the name it had when it was filed or by the official form number (UCC-5), which it used.  For clarity, the Court will use the name originally employed, the "Correction Statement," and discuss its legal effects hereafter.

conclusion by looking to N.C. Gen. Stat. § 25-9-102(a)(72), which defines "record" as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form."[11]  The Official Comment notes that "[w]hatever is filed in the Article 9 filing system, including financing statements, continuation statements, and termination statements, . . . would fall within the definition."

Article 9 defines "financing statement" as "a record or records composed of an initial financing statement and any filed record relating to the initial financing statement" in N.C. Gen. Stat. § 25-9-102(a)(39).  Thus, according to the Bank's interpretation, one must read the entire file to understand what constitutes the "financing statement."

Because the November 10, 2009, Correction Statement expressly references the Bank's original 1997 Financing Statement and "relates to" the initial Financing Statement, the Bank contends that the Correction Statement became part of the Bank's "Financing Statement" by virtue of N.C. Gen. Stat. § 25-9-102(a)(39).  According to the Bank, from and after November 10, 2009, the record reflected a "Financing Statement" consisting of the Bank's original 1997 filing, the two Continuation Statements, the Termination Statement, and the "Correction Statement."  All were properly indexed under the Debtor's correct name, and a searcher would have located all of them.

The Bank argues this amalgamated "Financing Statement" was sufficient to perfect its security interest throughout the period its loan was outstanding, despite the Termination Statement, because it provided the information required by N.C. Gen. Stat. § 25-9-502(a): (1) the name of the debtor, (2) the name of the secured party or its representative, and (3) an indication of the collateral covered by the financing statement.  Official Comment 2 interprets the section as

---

[11] The Bank finds this broad definition of "record" especially helpful to its cause because the current definition is not in the 1972 version of the statute, under which <u>Kitchin</u> and other cases the Plaintiff cites to were decided.

adopting a "notice filing" system: "The notice itself indicates merely that a person may have a security interest in the collateral indicated.  Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs."  N.C. Gen. Stat. § 25-9-502 cmt. 2.  The Bank contends that any creditors searching UCC filings after November 10, 2009, for entries indexed under the Debtor's name would have located not only the erroneously filed Termination Statement, but also the November 10, 2009, Correction Statement, which immediately follows in the filing chain.  This, it contends, would put them on notice that the Termination Statement had been filed in error and require further inquiry by those creditors to disclose the circumstances of the existing security interest.

At hearing, the Bank referenced the AEG Liquidation Trust case, in which a New York state court applied the "notice filing" principle recognized under UCC § 9-502 not just to financing statements, but termination statements as well.  AEG Liquidation Trust v. Toobro N.Y. LLC, 2011 WL 2535035 at *9 n.1 (N.Y. Sup. 2011).  The Bank extends the inquiry notice principle to *any* statement put on the record under the 1998 version of the UCC—not just UCC-1 financing statements.[12]

In further support of its contention that one must interpret the entire record to determine whether a security interest is properly perfected, the Bank also cites the Commercial Millwright case.  See Statement of Supplemental Authority, ECF No. 32-1.  In Commercial Millwright, an Iowa Bankruptcy Court noted that "[t]here is authority for the proposition that two individually insufficient filings of various types can be construed together to satisfy the requirements of a

---

[12] It appears the notice inquiry principle was extended beyond application to a UCC-1 in the AEG Liquidation Trust case, but the extension does not appear to go as far as the Bank would like it to.  In that case, the Court only extended notice filing to termination statements, by concluding that the termination statement is part of the financing statement through analysis of their respective definitions: a financing statement includes "any filed record *relating to the initial financing statement*[,]" and a termination statement "identifies . . . *the initial financing statement to which it relates* . . . ."  AEG Liquidation Trust, 2011 WL 2535035 at *9 n.1 (citing U.C.C. § 9-102(39) & (79)) (emphasis added).  The same analysis is not as clear when applied to correction statements.

financing statement." <u>U.S. v. Lincoln Savings Bank (In re Commercial Millwright)</u>, 245 B.R. 597, 601 (Bankr. N.D. Iowa 1999) (citing <u>In re APF Indus., Inc.</u>, 112 B.R. 446, 448 (Bankr. M.D. Fla. 1990); <u>In re Waldick Aero-Space Devices, Inc.</u>, 71 B.R. 932, 937 (D. N.J. 1987); <u>Miami Valley Production Credit Ass'n v. Kimley</u>, 536 N.E.2d 1182, 1185 (1987); <u>In re Heger</u>, 133 B.R. 612, 616 (Bankr. S.D. Ohio 1991)).  The Bank would have this Court apply this "tape and baling wire" approach in this case, to reach the conclusion that the Bank's November 10, 2009, Correction Statement that was not a Correction Statement should be construed together with all of the other documents in the file to satisfy the requirements of perfection—meaning to nullify the termination of that security interest caused by the earlier filed Termination Statement. That is much more weight than tape and baling wire can hold.

The Court in <u>Commercial Millwright</u> goes on to say: "However, there is also authority that after a financing statement has lapsed for failure to file a continuation statement within five years, nothing remained to be continued and a subsequently filed continuation statement was, therefore, ineffective."  <u>In re Commercial Millwright</u>, 245 B.R. at 601 (citing <u>In re Ellingson Motors, Inc.</u>, 139 B.R. 919, 924 (Bankr. D. Neb. 1991).  Additionally, the Court noted that perfection is supposed to "protect outside parties by providing clear notice."  <u>In re Commercial Millwright</u>, 245 B.R. at 602.  But in that case, the series of filings created confusion:

> A new financing statement was necessary to perfect the Bank's new, postconfirmation security interest in property of the reorganized Debtor. The Bank failed to file a new financing statement.  The March 1994 continuation statement combined with the April 1989 financing may not have been misleading to the parties involved.  However, for those individuals for whom such notice is intended, these documents were seriously misleading and therefore ineffective to perfect the Bank's postconfirmation security interest.

<u>Id.</u> at 603.

This case is similar to the <u>Commerical Millwright</u> case in that a new financing statement was necessary to re-perfect the Bank's security interest; the old Financing Statement had already been terminated, and it could not legally be revived with the document filed November 10, 2009. Filing a document entitled "Correction Statement"—regardless of whether the Bank intended it to be a correction statement or something else—and expecting that document to satisfy the requirements for perfection is grossly confusing to those individuals for whom notice is intended, especially since the statute specifically states that the record is not affected by a correction statement.  N.C. Gen. Stat. § 25-9-518(c).

Even if the November 10, 2009, Correction Statement was capable of affecting the record, the intent of that document is unclear.  By merely stating the Financing Statement was "TERMINATED IN ERROR," it is ambiguous whether the Bank was claiming that perfection should reach back to the date of the termination error, or whether re-perfection was taking place upon the filing of the "Correction Statement" on November 10, 2009.  The Bank has since informed the Court that it claims re-perfection did not occur until November 10, 2009; however, an individual's review of the record would not necessarily result in such an assumption.  As discussed above, an individual reviewing the record would most likely assume the "Correction Statement" did not have any effect on the record under the statute, leading to the conclusion that the Bank no longer had a perfected security interest.  Section 25-9-506(a) provides that "[a] financing statement substantially satisfying the requirements of this Part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading."  N.C. Gen. Stat. § 25-9-506(a).  The record appears to be seriously misleading.

The Bank doggedly asserts that the Financing Statement is not in fact seriously misleading under N.C. Gen. Stat. § 25-9-506(a) by reference to the <u>Bonds</u> case. <u>Bonds</u> holds that errors in a financing statement that do not mislead the searcher as to the possible existence of a security interest do not destroy the efficacy of the financing statement. <u>In re Bonds Distrib. Co.</u>, 39 F. App'x 895 (4th Cir. 2002). In that case, the Fourth Circuit sought to predict how the Supreme Court of North Carolina would decide whether the secured party's failure to include the address of the secured party on the financing statement rendered the financing statement misleading and thus ineffective. The Court ultimately found that the financing statement was effective despite the omission because future creditors were still put "on notice that [the secured party] had a security interest in [the Debtor's] assets." <u>Id.</u> at 899.

The facts of <u>Bonds</u> are quite different from this case. Omitting a secured creditor's address on a financing statement (as the secured party did in <u>Bonds</u>) is not comparable to filing a correction statement in an attempt to undo an erroneously filed termination statement. As noted above, it is not clear that a creditor seeing the Correction Statement in the record would be on notice that the Bank has a perfected security interest in the Debtor's Collateral.

Finally, the Bank asserts that the proper remedy in this case would be for the Court to employ its equitable powers to reform the November 10, 2009, filing to reflect the Bank's and Debtor's intent that the Bank have and maintain a perfected security interest in the Debtor's accounts receivable and inventory.

Such relief is unavailable for several reasons.

As an initial matter, the Correction Statement was ineffective to nullify the Termination Statement and to revive the Financing Statement because the Uniform Commercial Code, North Carolina statutes, and the Secretary of State's regulations explicitly state that correction

statements have no effect on a filed record.  Indeed, N.C. Gen. Stat. § 25-9-518(c) states, in full:

"Record not affected by correction statement.  The filing of a correction statement does not affect

the effectiveness of an initial financing statement or other filed record."  The regulations repeat

this admonition.  18 N.C. Admin. Code 05B.0308 ("The filing of a correction statement shall

have no effect upon the status of the financing statement or any party to the financing

statement.").[13]  Even the Correction Statement filed by the Bank states on its face that "The filing

of this Statement does not amend any UCC record.  This Statement is for informational purposes

only."  Correction Statement, ECF No. 31-2.

Whereas the Bank now contends the UCC-5 Correction Statement it filed is not actually a

correction statement, but something else, it *is* in fact a correction statement—but one that is

ineffective, for several reasons.  Words have meaning.  It was the Bank's decision to file the

document entitled "Correction Statement" in the first place.  It cannot now claim that it was not

filing a correction statement.  Admittedly, the Bank erred in filing such a document.  N.C. Gen.

Stat. § 25-9-518 only authorizes debtors to file correction statements.  Subsection (a) of N.C.

Gen. Stat. § 25-9-518 explicitly states: "A person may file in the filing office a correction

statement with respect to a record indexed there under the person's name if the person believes

that the record is inaccurate or was wrongfully filed."  N.C. Gen. Stat. § 25-9-518(a).  That

clause authorizes a debtor, under whose name a record is indexed, to file a correction statement.

Id.  Records are not indexed under the secured creditor's name.  N.C. Gen. Stat. § 25-9-

519(c)(1).  Therefore, a creditor is not authorized to file a correction statement.[14]  That

---

[13] Indeed, the regulation dealing with filing errors underscores that a correction statement cannot correct an error—
an amendment is required to affect the record: "An error by a filer is the responsibility of such filer.  It may be
corrected by filing an amendment or a correction statement may disclose it."  18 N.C. Admin. Code 05B.0406(b).
[14] The 2010 amendments to U.C.C. § 9-518, specifically subsections (c) & (d)—which have not been adopted in
North Carolina—grant "an aggrieved secured party of record" the right already held by debtors to "express the belief
that a UCC financing statement is inaccurate or unauthorized."  The amendments "recognize that sometimes a
person files a termination statement without being entitled to do so.  The termination statement could be filed

conclusion is supported by the Official Comment to Section 9-518(a), which states in the first

sentences: "Former Article 9 did not afford a nonjudicial means for a debtor to correct a

financing statement or other record that was inaccurate or wrongfully filed.  Subsection (a)

affords *the debtor* the right to file a correction statement."  N.C. Gen. Stat. § 25-9-518 cmt. 2

(emphasis added).

The Official Comment further explains that the mechanism of filing a correction

statement is designed to permit an aggrieved person, i.e., the debtor, the opportunity to state its

position on the record, analogous to the remedy provided by the Fair Credit Reporting Act.  Id.[15]

But Section 9-518 "do[es] not permit an aggrieved person to change the legal effect of the public

record.  Thus, although the filed correction statement becomes part of the 'financing statement,'

as defined in Section 9-102, the filing does not affect the effectiveness of the initial financing

statement or any other filed record."[16]  Id.  In this case, the Correction Statement was not filed by

the Debtor, but by the Bank.  Obviously, the Bank was wrong in attempting to use a correction

statement to revive its perfected security interest.  The Correction Statement did not comply with

this provision of North Carolina's version of the UCC, rendering it a nullity.

---

maliciously, or by error of a competing secured creditor who mistakenly believes that the other creditor has been paid off.  A secured party is not required to file an information statement to dispute the record, but it does have the right to provide some limited public notice that the efficacy of the termination statement is disputed."  Barkley Clark & Barbara Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 16.02[6] (2012).  North Carolina has not adopted these amendments, but even if it had adopted them, it is not clear that the amendments would make the Bank's correction statement effective.  As the commentator noted, the amendments seem to envision a scenario in which a termination statement was filed by someone not entitled to do so.  The Bank in this case was entitled to file the termination statement; it just did so in error.

[15] The case law that has addressed the effect of a correction statement confirms that the purpose of a correction statement is to allow a debtor to address the issue of "bogus" filings by placing something in the public record when the debtor contests a financing statement.  Brown v. Thompson, 2009 WL 997509 (N.Y. Sup. Ct. 2009) (explaining the ability to file a correction statement provides a remedy to a victim of an illegal or bogus UCC financing statement); McDaniel v. 162 Columbia Heights Housing Corp., 863 N.Y.S.2d 346 (N.Y. Sup. Ct. 2008) (explaining that § 9-518 of the U.C.C. provides a "non[-]judicial means for a debtor to correct a financing statement [that] was inaccurate or wrongfully filed."  However, a correction statement will not affect the effectiveness of the initial financing statement).

[16] The provisions in N.C. Gen. Stat. § 25-9-518 that authorize the Secretary of State to correct the record also support this conclusion.  Under certain circumstances not applicable here, the Secretary of State may correct the record when a correction statement is filed.  No such request was made here because there was no basis for claiming that the Termination Statement should not have been accepted for filing.  See N.C. Gen. Stat. §§ 25-9-516, -518(b1).

The Correction Statement is also ineffective because it does not comply with subsection (b)(3) of N.C. Gen. Stat. § 25-9-518.  That provision provides that the Correction Statement must provide a "basis" for the person's (in actuality, the debtor's) belief that "the record is inaccurate and indicate the manner in which the person believes the record should be amended . . . or provide the basis for the person's belief that the record was wrongfully filed."  N.C. Gen. Stat. § 25-9-518(b)(3).  This provision plainly requires more than a statement that the record was wrongfully filed or filed in error.  It explicitly requires that the person provide the "basis" for the belief that the record is inaccurate or that the record was wrongfully filed.  Id.  Here, the Bank's Correction Statement merely says, in conclusory terms and without elaboration, "TERMINATED IN ERROR."  The Correction Statement provides no explanation for why any person (let alone the debtor) believed that to be the case, nor does it indicate how the record should be corrected.  In sum, the Correction Statement is a nullity and had no effect on the Termination Statement.  It is of no use to the Bank.

As to the Bank's contention that the Correction Statement somehow put the world on notice of its Lien, see Attachment B to New Financing Statement, Compl. Ex. 10, ECF No. 1-10, the Court would simply point out that allowing a correction statement's supposed "notice to the world" to "undo" the legal effects of a termination statement would allow it to do what the UCC and North Carolina law explicitly say a correction statement cannot do, namely "affect the effectiveness of . . . [a] filed record."  N.C. Gen. Stat. § 25-9-518(c).  As the Official Comment explains, the very purpose behind the correction statements is to afford debtors who are "aggrieved" by a UCC filing a remedy similar to that provided in the Fair Credit Reporting Act.  N.C. Gen. Stat. § 25-9-518 cmt. 2.  A correction statement is designed to give notice to the world of a debtor's position with respect to a UCC filing by a creditor.  Nothing in N.C. Gen. Stat.

§ 25-9-518 provides authority for the Bank's argument that the world received notice of its Lien upon the filing of the Correction Statement.   Moreover, any creditor who searched the filing chain for the Original Financing Statement would have seen the Termination Statement.   A subsequently-filed correction statement, having no legal effect and designed to be used by debtors, could not be understood to have any effect on that termination.   Furthermore, the UCC puts the burden of maintaining a perfected lien on the Bank—and no one else—which is precisely the point made by the Court in Roswell Capital Partners (discussed above).   Roswell Capital Partners, 2010 WL 3452378, at *7.

For the foregoing reasons, the Correction Statement is of no legal effect.   The Bank's Lien remained unperfected after the filing of the November 10, 2009, Correction Statement.

## IV.  Because the Bank's Lien was Unperfected after the Filing of the Correction Statement, the Filing of a New Financing Statement Constitutes a Transfer of an Interest of the Debtor in Property.

The Defendants deny that the filing of the New Financing Statement constituted a transfer of an interest of the Debtor in property.  Compare Compl. ¶ 34, ECF No. 1, with Answer of Bank of Granite ¶ 34, ECF No. 10.  Their denial appears to be founded on the assertion that the Original Financing Statement had been reinstated by the filing of the Correction Statement. As demonstrated above, this contention is wrong as a matter of law.  There is little question that, for bankruptcy purposes, the filing of the New Financing Statement constituted a transfer of an interest in property of the Debtor under the Code.   See 11 U.S.C. §§ 547(e), 548(d). Accordingly, the Trustee is entitled to summary judgment as to that issue.

Under 11 U.S.C. § 547, the perfection of a security interest is a transfer subject to avoidance.  See 11 U.S.C. § 101(54).  A transfer, for purposes of bankruptcy law, is defined very broadly, and includes "the creation of a lien" as well as "each mode, direct or indirect, absolute

or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."  11 U.S.C. § 101(54)(A) & (D).  It follows, therefore, that because the Original Financing Statement became ineffective upon filing of the Termination Statement and resulted in an unperfected Lien, the re-perfection of the Lien qualifies as a transfer under bankruptcy law. Taken to its logical conclusion, and one which is widely accepted,[17] when a creditor re-perfects its security interest in a debtor's property after the original perfection has lapsed, the re-perfection of the security interest potentially constitutes a preferential transfer of property, avoidable under 11 U.S.C. § 547(b).

For the purposes of 11 U.S.C. § 547, a transfer is deemed made as of the date of the perfection of the security interest, and not on the date on which it was created except where perfection occurs within thirty days of creation.  11 U.S.C. § 547(e)(2)(B).  When there is a gap in perfection, perfection is not continuous, and the date of perfection is the date of filing of the latter financing statement.  N.C. Gen. Stat. § 25-9-308(c); U.C.C. § 9-308 cmt. 4, example 1. Thus, the filing of the New Financing Statement does not relate back to the date of the filing of the Original Financing Statement.  As stated in the Official Comment to U.C.C. § 9-308, the "security interest would be vulnerable to any interests arising during the gap period which under Section 9-317 take priority over an unperfected security interest."  U.C.C. § 9-308 cmt. 4, example 1.

A transfer of interest of the Debtor in property took place on the date that the Lien was potentially re-perfected—the day the New Financing Statement was filed.  See 11 U.S.C.

---

[17] Blasbalg v. Tarro, 158 B.R. 555, 565 (D. R.I. 1993) (citing In re Karisda, Inc., 90 B.R. 196 (Bankr. D.S.C. 1988)). See also Provident Hosp. & Training Ass'n v. GMAC Mortg. Co. of Pa., 79 B.R. 374, 378–79 (Bankr. N.D. Ill. 1987) (as applied to 11 U.S.C. § 547, where the perfection of a security interest lapses, a transfer is deemed to have occurred at time of re-perfection); In re Abell, 66 B.R. 375, 381-82 (Bankr. N.D. Miss. 1986) (when a perfected security interest lapses, a transfer under 11 U.S.C. § 547 occurs upon the date of filing of the second financing statement).

§547(e)(2)(B).  Section 547(e)(1)(B) further defines the concept of perfection by stating that a "transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee."  11 U.S.C. § 547(e)(1)(B).  In order to determine when a creditor cannot acquire a judicial lien superior to the transferee's interest, a court must look to applicable state law.  See Howard Thornton Ford, Inc. v. Fitzpatrick, 892 F.2d 1230, 1232 (5th Cir. 1990); Long v. Joe Romania Chevrolet, Inc., 175 B.R. 56, 60–61 (B.A.P. 9th Cir. 1994).  North Carolina law is clear.  N.C. Gen. Stat. § 25-9-317(a)(2) provides that a lien creditor has priority over an unperfected security interest.

Here, the Bank's Lien became unperfected as a consequence of its filing of the Termination Statement.  It remained unperfected until the filing of the New Financing Statement, i.e., within the 90-day period preceding bankruptcy.  Prior to the date of the New Financing Statement, any other creditor could have acquired a judicial lien superior to the Bank's interest. As a result, the filing of the New Financing Statement was a transfer of an interest of the Debtor in property because it constituted perfection of an unperfected security interest.

**BASED ON THE FOREGOING**, partial summary judgment as to phase one issues is **GRANTED** in favor of the Plaintiff and **DENIED** as to the Defendants.


**SO ORDERED.**

**This Order has been signed electronically.**                    **United States Bankruptcy Court**
**The Judge's signature and Court's**
**seal appear at the top of the Order.**